IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Case No. 1:15-CR-00126 (AJT)** |
| | ) | |
| RIVKA RABI, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

### I.    INTRODUCTION

If Freddie Joe Booker of *Booker*[1] fame had not come along before her, Rivka Rabi would have been a splendid candidate to illustrate to the Supreme Court the problems embedded in the one-size-fits-all straightjacket of *mandatory* sentencing guidelines. Fortunately, the sentencing guidelines do not mandate the sentencing range for Ms. Rabi. While the Court must consider the applicable sentencing guidelines, we respectfully submit that the driver for Ms. Rabi's sentence should be non-guideline considerations, that is, an "individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007)(citing *Rita v. United States*, 551 U.S. 338 (2007)).[2] For reasons set out below, Ms. Rabi respectfully requests that she be granted a sentence of probation with appropriate conditions. Such a sentence, coupled with the agreed forfeiture amount of $54,821.15, is a reasonable sentence based on an individualized assessment and the facts particular to Ms. Rabi, and it is sufficient, but not "greater than necessary" to satisfy the statutory goals of sentencing. *See* 18 U.S.C. § 3553(a).

---

[1]     *United States v. Booker*, 543 U.S. 220 (2005).

[2]     Although the Court will in the first instance determine the appropriate guideline calculation, this memorandum will first address the non-guideline considerations and will address the proper guideline calculation at the end, beginning at page 10.

Ms. Rabi engaged undersigned counsel shortly after federal agents raided her home at the end of December 2014. It was quickly evident that Ms. Rabi was seriously stunted in her emotional growth and her ability to process information. What might seem obvious to others was anything but to her. There was no doubting that after the raid of her home, Ms. Rabi well understood that she had been involved in illegal activity. What was not so clear was when she came to that realization. After all, Ms. Rabi was the very picture of innocence – albeit in its common, not legal usage. How was it that she got into this mess?

## II.   RIVKA RABI'S ROLE IN THE OFFENSE

In the summer of 2012, Rivka Rabi's husband Moshe received a call from his brother, Shlomo Rabi, who was then working for a company called TC Medical. At the time, Moshe was working part-time, looking for full-time employment. As Shlomo explained it, TC Medical was owned by Dr. Reuven Lexier, whom Moshe knew personally as a highly respected doctor in the Orthodox Jewish community in Toronto, Canada.[3] Moshe and Shlomo Rabi had grown up in the community and knew the Lexiers. Shlomo and Moshe Rabi were friends with Dr. Lexier's son, Tzvi. These personal relationships, coupled with what Moshe knew about Dr. Lexier's professional reputation, led Moshe and Rivka to trust in the bona fides of TC Medical when Shlomo offered Moshe an opportunity with TC Medical to earn some income while he was still looking for full-time employment.

Initially, the job entailed receiving checks from various clinics and doctors in payment for pharmaceuticals, taking pictures of the checks, and forwarding the checks to the TC Medical accounting department in Toronto. The stated purpose for having the checks routed through the

---

[3]   While Ms. Rabi's conduct undoubtedly related to both TC Medical and SB Medical, Ms. Rabi was unaware of the distinction. As far as she knew, she was working for TC Medical. This memorandum will refer only to TC Medical, but Ms. Rabi does not argue that she worked for one company and not the other.

Rabis' home was to take some of the pressure off the primary American office located in Baltimore, which had become too busy to handle the workload. Initially Moshe was doing the work, but in October 2012, Moshe obtained a full-time job with his current employer. His wife, Rivka, then took over, continuing the work that Moshe had begun with TC Medical. From October 2012 until the agents raided her home on December 23, 2014, Ms. Rabi was responsible for the TC Medical activities that took place out of the Rabis' home in Lakewood, New Jersey.

By the time Ms. Rabi took over, she was no longer just handling checks. She had begun receiving drug products at her home that doctors and clinics returned to TC Medical. Ms. Rabi did not know why these products were returned, she was simply told by the people she reported to at TC Medical that she should send the drugs to the Baltimore warehouse. And she did. Eventually Ms. Rabi was instructed by her superiors to begin shipping drugs directly to clinics. She received the drugs at her home – or at one of several UPS boxes she opened at the request of David Burke, who was another founder and manager of TC Medical – and sent them on to customers. She did as she was told. Ms. Rabi was not part of the decision making team at TC Medical. She took direction from David Burke, Shlomo Rabi, Aaron Klein and Albert Simmons, among others.

There were red flags along the way, flags that would normally have caused someone to question the legality of what TC Medical was doing. These included emails to Ms. Rabi to the effect that the company was operating in a "grey area," that what they were doing was "not 150% kosher." And when she saw these flags, Ms. Rabi would call Canada, where she would receive one assurance or another, words to the effect that the government doesn't like it, or the government frowns on it, but if you do it right, as she was assured TC Medical was, there is nothing illegal about it. She also received a letter, in the nature of a warning, from the FDA. She

didn't understand what it meant, so she sent it to David Burke and Aaron Klein. Burke contacted her promptly, telling her not to worry, it was a mere formality and did not mean anything. He went on to tell her that the Baltimore warehouse received these kinds of letters every other day, and he dismissed her concerns.

What is telling about these exchanges is that Ms. Rabi *was* concerned. She was looking for assurances that what she was doing was not illegal. David Burke and her superiors in Canada were indirect and less than explicit in their warnings ("grey area"; "not 150% kosher"), but they were direct and explicit in their assurances. The combination was enough to keep Ms. Rabi, if not totally comfortable, at least satisfied that she was not doing something illegal. Undoubtedly, David Burke and others in Canada knew what they had in Ms. Rabi, someone who would do what she was told, someone easy to manipulate, and someone who was easily assured. They took advantage of that.

Ms. Rabi had a minimal role in the conspiracy. And the personal gain to her – some $54,000 over more than two years – was quite modest, in keeping with her role. Given the world that she occupied, that she shared with her family, including her two infant children, there is simply no reason to think that she would knowingly put that world at risk for such a modest gain if she fully appreciated the legal ramifications of her actions.

In the end, Ms. Rabi is grievously aware that she has only herself to blame for her failure to heed the flags that were raised before her. She accepted assurances from within rather than consult some source from outside the company. An internet search probably would have been enough. Why didn't she understand what should have been clear? Why did she accept assurances from Canada for so long, when others would not have? The answer, we submit, can be found in Ms. Rabi's personal history.

### III.    RIVKA RABI'S PERSONAL HISTORY

Ms. Rabi, 26 years old, is the oldest of eight siblings born in Long Island, New York. If there is one element that has defined her life and who she is, it is Orthodox Judaism. She and her family were living in Chicago, but when she was 10 years old, her family moved to Lakewood, New Jersey. The reason for the move was explicitly to move to an even more insular Orthodox Jewish community than the one the family had inhabited in Chicago. The parents' stated goal was to remove their children from the secular world, "to diminish the negative influences of everyday life such as immoral behavior, drugs, materialism, promiscuity, and other negative traits" that were considered inconsistent with their Orthodox Jewish faith. See Exhibit A, Letter from Ms. Rabi's parents.[4] They believed they would find that insular world in Lakewood, a virtual city-state for Orthodox Jews. See Exhibit B, Report of Dr. Mark J. Mills at n. 4.

The Court has a letter from Rabbi Aaron Twerski, a professor of law at Brooklyn Law School. See Exhibit C, Letter from Rabbi Aaron Twerski. He does not know Rivka Rabi; but he knows Orthodox Judaism and he knows Lakewood, New Jersey. His description of what it is like to grow up in Lakewood is probably unfamiliar to almost every other individual defendant who appears in this Court.

Ms. Rabi went to – but did not complete – high school at Bais Kaila. Rabbi Twerski points out that every aspect of popular culture, from television, to literature, to magazines, is prohibited or strictly controlled at that school. Literature taught in the classroom "is subject to exacting censorship." "Cynicism about what people might tell them that is part of the mental make-up of someone raised in a secular setting is not part of their training. … The antenna to

---

[4]    All of the exhibits cited in the memorandum have been filed under seal with permission of the Court. Order dated July 28, 2015, Dkt. 18.

pick up wrongdoing are drastically diminished. The price to be paid for this wholesome and narrower form of education is that it comes along with considerable naiveté." *Id*.

That was Ms. Rabi's world. What Rabbi Twerski would have predicted for her, "considerable naiveté," has been confirmed by Ms. Rabi's therapist, Valerie Rubin. Although Ms. Rabi makes no effort to deny her wrongdoing or her shame, Ms. Rubin nevertheless finds Ms. Rabi to be "tremendously naïve, highly suggestable [sic] and very self-deprecating." See Exhibit D, Letter from Valerie Rubin.

Because these qualities – characterized by counsel as a stunted ability to process information – were so evident when counsel was first meeting with Ms. Rabi, very early in the representation the decision was made to obtain a forensic evaluation to determine if there was a clinical explanation for what counsel perceived. Indeed there was.

Dr. Mark Mills, a forensic psychiatrist, has an enviable curriculum vitae. See Exhibit B, Report of Dr. Mark J. Mills. He has been retained to perform forensic work on behalf of both the defense and the prosecution, including the U.S. Attorney's Office in this Court as well as the U.S. Attorney's Office in the Eastern District of New York.  He is a well-respected and credible expert in his field.

Dr. Mills formed his professional judgment in this matter based on his own interaction with Ms. Rabi – he found her "shockingly naïve" – and he also relied on three well-validated psychological tests that he administered to Ms. Rabi. His report speaks for itself, but Dr. Mills' findings and his interpretation of the three psychological tests confirms the observation that Rivka Rabi, an intelligent young woman with a good vocabulary, nevertheless has a diminished capacity to process information and has a propensity to misinterpret simple sentences that would easily be understood by most people. In his opinion, Ms. Rabi did not have the sort of mens rea

and culpability that would be typical of someone entering a criminal conspiracy. See Exhibit B, Report of Dr. Mark J. Mills.

While the deficits that Dr. Mills observed and documented seem plainly rooted in the insular world that Ms. Rabi has inhabited, there is another reason, also rooted in Orthodox Judaism, that would account for her acceptance of what she was being told, that her company was doing nothing illegal.

The laws that an Orthodox Jew living in Lakewood must follow come from centuries of commentary on the Torah (the five books of the Old Testament). Through these discussions, contained in the Talmud,[5] the Old Testament edicts have been interpreted and reinterpreted, argued over and discussed, and ultimately adapted to prescribe how people should live their lives in the twenty-first century. Whether it is G-d, or the Rabbi, or the father, or the husband who sets down the law, Orthodox Judaism is a patriarchal society. In matters outside the home, the male is dominant and is the one who speaks with authority.

It should not be surprising then that when Ms. Rabi's male superiors in her company gave her direction, or defined what was acceptable, or explained something to her, she accepted it as writ. That was her normal, learned behavior on matters that did not involve the traditional role of wife, mother, and keeper of the household.

The Court of course is required to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). A defendant's

---

[5] By way of gross over-simplification, Jewish law stems from interpretation and commentary on the Torah. The oral law stemming from the interpretation was first reduced to writing around 200 C.E. and is known broadly as the Mishna. Commentary on the Mishna is known as the Gemara. Together the Mishna and the Gemara are codified in the Talmud. The binding force of Jewish law, as it applies to life in present times, is based in these texts and rabbinical interpretations stretching back to the Old Testament. Encyclopedia Judaica, 1st Ed., "Codification," vol. 5, pp. 627-655, Keter Publishing House, Jerusalem, Israel, 1971.

cultural heritage has a direct impact on his or her mens rea. "Considering the cultural circumstances surrounding every individual defendant at the sentencing stage serves to exact the individualized justice that is a foundational principle of our criminal justice system." Damian W. Sikora, *Differing Cultures, Differing Culpabilities?: A Sensible Alternative: Using Cultural Circumstances as a Mitigating Factor in Sentencing*, 62 Ohio St. L.J. 1695, 1722 (2001)(analyzing various cases where juries have convicted defendants of lesser included offenses and judges have used their discretion to hand down lower sentences based on the diminished mens rea that can come from cultural influences). *See also, United States v. Le*, unpublished, 2009 WL 2947370 (E.D. Va. Sept. 14, 2009)(defendant allowed to withdraw guilty plea to assert defense that he was culturally incapable of forming the requisite mens rea for the charged offense).

We are not arguing that Ms. Rabi is not guilty. We submit instead that her culpability is substantially mitigated by her diminished capacity to understand the legal ramifications of her actions. Her upbringing and the cultural and faith-based norms that were part of her learned behavior left her ill-equipped to analyze the information she had or to handle the manipulations of her male superiors at TC Medical.  Simply stated, Rivka Rabi was not good at thinking for herself.

From the moment the federal agents showed up at her house at the end of last year, Ms. Rabi has been overcome – sometimes uncontrollably so – with remorse for her actions and for the harm that she has done to her own self-image and most especially for the harm that she has done to her children.[6] She immediately sought professional therapy with Valerie Rubin to help

---

[6]     See Exhibit D, Letter from Valerie Rubin; Exhibit E, Letter from Rabbi Benstein; Exhibit F, Letter from Rivky Rabinowitz; Exhibit G; Letter From Rabbi Tendler; Exhibit H, Letter from Hindy Klein; Exhibit I, Letter from Moshe Rabi; Exhibit J; Letter from Mark Seigel.

her understand how this happened to her. And she immediately committed to cooperate with the investigation. She also did something quite unusual for someone in her situation: without any agreement with the government, or assurances from the government, she testified before the grand jury, incriminating herself in the conspiracy. She did so knowing the risk that the government would eventually decide to prosecute her, which it eventually did. She pled guilty, and she has continued to cooperate with the government and was prepared to testify in the case of David Stein before he pled guilty shortly before his trial. We expect that the government will be making a motion under U.S.S.G. § 5K.1.1 for a downward departure from whatever guideline range that the government will otherwise argue is applicable.

## IV.     ADDITIONAL CONSIDERATIONS PARTICULAR TO MS. RABI AND HER FAMILY

Under seal, the Court has certain material pertaining to Ms. Rabi's two young sons, age 5 and 2. This includes medical and scholastic records for her older son. See Exhibit K. Without going into detail because of privacy concerns, it is sufficient to note that these two young children, especially the older one, are currently in a fragile place, facing significant developmental challenges. The anticipated changes to the older son's education in the upcoming years will be challenging enough for him with his mother fully present. Consistency in care is critical to his proper development. There is no other person better suited to care for his needs than his mother. See Exhibit I, Letter from Moshe Rabi.

Being mother and caregiver to these two delicate children during their formative years is really the role that Ms. Rabi was trained for and that she has thus far performed beautifully. Whatever considerations that favor leniency for Ms. Rabi, none come close in power to the imperative that her two young sons not be deprived of the care of their mother. We say that mindful that many defendants who appear before this Court have family members who would

9

face negative consequences if that defendant were incarcerated. But surely Ms. Rabi's case is different. Especially given the mitigating circumstances in this case, including Ms. Rabi's minimal role in the offense and the level of her culpability, visiting on these young, innocent, fragile souls the incalculable damage that would flow from removing their mother from their care cannot possibly serve the interests of justice.[7]

## V.    THE SENTENCING GUIDELINES

The Presentence Investigation Report ("Report") filed in this case recommends an advisory guideline offense level of 19 (30-37 months) by using the base offense level of 6 found in U.S.S.G. § 2B1.1(a)[8], and applying the following adjustments:

18-level enhancement to reflect a loss of $4,178,869, pursuant to U.S.S.G. § 2B1.1(b)(1)(J);

2-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(10)(B)&(C);

4-level reduction for minimal role pursuant to § 3B1.2(a),  and;

3-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.

### A.    The Report's Alternative Calculation of Gain Is Inflated

In arriving at the 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J), the Report states that because "the total loss cannot be reasonably determined, the Court can use the gain as an alternative measure of loss. The defendant's total gain during the instant offense was

---

[7]    Because the minimum security facility for women in Danbury, Connecticut is closed, Alderson, West Virginia, 475 miles from Lakewood, would be the closest minimum security facility for women. The alternatives of being assigned to a "low" rather than a camp, or being assigned to a camp but at great distance from Ms. Rabi's young children, only compound the unfairness of a sentence of incarceration in this case.

[8]    U.S.S.G. § 2N2.1 is the section of the guidelines that applies to the statutes the TC Medical conspiracy violated. Section 2N2.1(c)(1) cross references § 2B1.1 in the event there was fraud. Therefore, in this case, § 2B1.1 is the relevant chapter.

$4,178,869." In her plea agreement, there is no stipulation as to loss amount, and Ms. Rabi is free to argue a different loss amount.

The amount of defendant's gain as calculated in the Report ($4,178,869) is derived from the gross amount of drugs that passed through Ms. Rabi's home in New Jersey. At most, it was the amount that she "touched," not the amount that she got or kept. That amount grossly overstates the gain to the defendant. The appropriate figure to use would be $54,821.15. That was the value of Ms. Rabi's personal gain for her role in the conspiracy.[9]

Using $4,178.869, based on "defendant's total gain," as an alternative measure of loss perversely and unjustly distorts the loss amount as a proxy for the gravity of the offense. For example, the loss number that is used for Ms. Rabi, who had a minimal role, vastly exceeds the stipulated loss number for Shlomo Rabi, who played a major role as director of sales and operated within the hub of the conspiracy in Canada, where he was knowledgeable about the entire scope of the conspiracy. *See United States v. Shlomo Rabi*, 1:15-CR-00063, Dkt. 7 at ¶ 4 (Shlomo Rabi's plea agreement holds him responsible only for a loss of between 1.0 and 2.5 million dollars). In short, use of gain to the defendant of $4,178,869 inappropriately aggravates the offense level for Ms. Rabi, yielding a result that is unfair and unjust.

B. Ms. Rabi's Conduct Does Not Warrant an Enhancement Pursuant to § 2B1.1(b)(10)(B) or (C)

Section 2B1.1(b)(10)(C) requires that a defendant's scheme involved the use of sophisticated means. In order for the enhancement to apply, the means the defendant employs must be "more than the concealment or complexities inherent in fraud." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014)(citing *United States v. Jinwright*, 683 F.3d 471, 486

---

[9] While this is the gross amount she received, which will be subject to the agreed forfeiture order, her net gain, after the taxes that the government has already received, is about $13,000 less.

(4th Cir. 2012)). While Ms. Rabi's actions might, on the surface, appear to qualify as planning aimed at concealing her participation with TC Medical and the company's importation of drugs, that is not enough to apply the enhancement. "The enhancement for sophisticated means does require more than just thoughtful or potentially successful planning." *Adepoju*, 756 F.3d at 259.

It is true that cmt. n. 9(B) to § 2B1.1 lists the use of fictitious entities as one example of sophisticated means. However, cmt. n. 9(B) also contains "corporate shells" and "offshore accounts" in the same list. Presumably the listed items are meant to be interpreted as like items, *ejusdem generis*. When viewed in the context of the other examples, Ms. Rabi's use of fake names to open her UPS boxes, and her use of her home address as the address of TC Medical, is not the type of conduct the Sentencing Commission envisioned for application of the enhancement. In *United States v. Hance*, 501 F.3d 900 (8th Cir. 2007), the defendant opened up a post office box under an assumed name and used it as a return address for his mail fraud scheme. The Eighth Circuit held that such acts did not distinguish themselves from the multitude of other fraud cases. *Id*. at 910. Similarly, Ms. Rabi's individual actions are no more than the simple planning endemic to fraud cases. *See Adepoju*, 756 F.3d at 257.

As the government acknowledges, the sophisticated portion of the conspiracy was devised by Tzvi Lexier and David Burke. See Statement of Facts at ¶ 7. The Report also notes that Tzvi Lexier and David Burke were the leaders of the conspiracy and directed the actions of the other participants. Report at ¶ 18-19. From the details contained both in the Statement of Facts and the Report, it is apparent that Messrs. Lexier and Burke devised the manner and means of the sophisticated offshore transactions. As is evident from the communications to Ms. Rabi from her superiors, whatever sophisticated means were employed within the conspiracy, none

was the creation or brainchild of Ms. Rabi. Whatever she did that might be regarded as sophisticated, it was at the direction of others.

Additionally, § 2B1.1(b)(10)(B) applies a 2-level enhancement if a substantial amount of the conduct of the offense occurs outside of the United States, but applying § 2B1.1(b)(10)(B) in the present case would amount to impermissible double counting. Double counting occurs when "a provision of the Guidelines is applied to increase punishment on the basis of a consideration that has been accounted for by the application of another Guideline provision or by application of a statute." *United States v. Reevey*, 364 F.3d 151, 158 (4th Cir. 2004)(citing *United States v. Rohwedder*, 243 F.3d 423, 426-27 (8th Cir. 2001)). More specifically, the bar on double counting prevents the application of an enhancement when the underlying offense itself necessarily includes the same conduct as that enhancement. *United States v. Bragg*, 207 F.3d 394, 400 (7th Cir. 2000)(superseded by regulation on other grounds). That is precisely what is happening in this case. As paragraph 10 of the Information filed in this case makes clear, the conspiracy was devised to import misbranded drugs and medical devices from abroad. Importing drugs from abroad necessarily includes a substantial amount of conduct outside of the United States. Applying the enhancement here would mean that every offense regarding importing misbranded drugs would receive an automatic 2-level enhancement, which is contrary to the Commission's intention when it assigned a base-level of 6 to this offense.

    C.    <u>The Proper Offense Level Calculation is 6</u>

Using defendant's personal gain of $54,821.15 as the appropriate alternative for actual loss yields a 6-level enhancement pursuant to § 2B1.1(b)(1)(D). With a 4-level reduction for minimal role and a 2-level reduction for acceptance of responsibility, we respectfully submit that the correct advisory offense level calculation should be 6, with a corresponding recommended sentencing range of 0-6 months. This range is Zone A of the guidelines' sentencing table, so that

even if the Court were to impose a guidelines sentence, a term of probation would be allowed. U.S.S.G. § 5B1.1.

If the offense level were correctly calculated at level 19 (30-37 months), it would significantly overstate the seriousness of Ms. Rabi's conduct. When the guidelines overstate the seriousness of the offense, as is the case here, it is "an encouraged basis for departure." *United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000). Strict reliance on U.S.S.G. § 2B1.1 in this case is too formulaic for a sentencing procedure that must consider Ms. Rabi's individual circumstances. Reliance on that guideline focuses almost exclusively on money, and is not a good measure of Ms. Rabi's conduct. In terms of her role and her level of culpability, this is not a $4,000,000 case. *See generally, United States v. Kalili*, 100 F. App'x 903, 906 (4th Cir. 2004)("While Kalili's offense level was correctly increased to 17 based on intended loss of over $800,000, it is clear this was not an $800,000 case."). The guidelines are simply too blunt an instrument to be used in a case such as this where the leaders of a conspiracy fully expect, and intend, to reap a profit of millions of dollars and they use a limited participant such as this defendant to do their bidding in a portion of the conspiracy, while the minor player earns, as fully expected by the key conspirators, a comparative pittance. The guidelines acknowledge this concern and propose a downward departure to resolve it: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." U.S.S.G. § 2B1.1 cmt. n. 20(C). Even if the Court were to adhere to guideline principles, a sentence of probation, especially considering Ms. Rabi's substantial assistance to the government, would be appropriate.

## VI.     ADDITIONAL CONSIDERATIONS IN FAVOR OF PROBATION

Sentencing first-time, non-violent offenders to alternatives to prison has become increasingly accepted among judges, legal scholars, politicians, lawyers and other professionals across the country.[10] While much of the discourse, including from the President and the Attorney General, has focused on nonviolent drug offenders who crowd our prisons, the same considerations in favor of alternatives to prison, even more so, should apply in the case of someone like Rivka Rabi, a criminal defendant who is as far removed from a criminal type as one could be. It hardly needs saying that she is not a risk to re-offend.

## IX.     CONCLUSION

For the reasons discussed above, Ms. Rabi respectfully submits that a rigid application of the advisory guidelines in this case would produce an unduly harsh result that does not give full consideration to the factors outlined in 18 U.S.C. § 3553(a). In light of the unique circumstances of this case as they relate to her, Ms. Rabi, through counsel, respectfully submits that a sentence of probation with appropriate conditions, coupled with the agreed forfeiture payment of $54,821.15, will fulfill the Court's sentencing obligations of imposing a sentence in accordance with 18 U.S.C. § 3553(a).

---

[10]     On November 10 of 2014 the Criminal Justice Section of the American Bar Association issued a final draft of a report regarding the reform of federal sentencing for economic crimes. One of a number of recommended changes to the sentencing guidelines included an offense level cap of 10 for non-serious offenses by first time offenders: "If the defendant has zero criminal history points under Chapter 4 and the offense was not 'otherwise serious' within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate." A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes. Available at:
http://www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.authcheckdam.pdf (Last visited July 31, 2015).

Respectfully submitted,


/s/ Robert P. Trout
Robert P. Trout
(Va. Bar No. 36166)
rtrout@troutcacheris.com
TROUT CACHERIS & JANIS PLLC
1350 Connecticut Avenue, N.W. Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202 464-3319

Counsel for Rivka Rabi

/s/ Jesse Winograd
Jesse Winograd
(Va. Bar No. 79778)
jwinograd@troutcacheris.com
TROUT CACHERIS & JANIS PLLC
1350 Connecticut Avenue, N.W. Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

Counsel for Rivka Rabi

## Certificate of Service

I hereby certify that on this 31st day of July, 2015, I electronically filed a copy of the foregoing Memorandum with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

>Kellen Dwyer
>Kellen.Dwyer@usdoj.gov
>U.S. Attorney's Office
>Eastern District of Virginia
>2100 Jamieson Avenue
>Alexandria, Virginia 22314
>Phone: (703) 299-3700

The sealed items are being hand-delivered to both the Clerk's Office and above listed AUSA.

>/s/ Jesse Winograd
>Jesse Winograd
>(Va. Bar No. 79778)
>jwinograd@troutcacheris.com
>TROUT CACHERIS & JANIS PLLC
>1350 Connecticut Avenue, N.W. Suite 300
>Washington, D.C. 20036
>Phone: (202) 464-3300
>Fax: (202) 464-3319
>
>Counsel for Rivka Rabi